J-A13020-25

2025 PA Super 186

COMMONWEALTH OF PENNSYLVANIA : IN THE SUPERIOR COURT OF
: PENNSYLVANIA
:
v. :
:
:
:
MICHAEL ALDRICH :
:
Appellant : No. 851 WDA 2024

Appeal from the Judgment of Sentence Entered June 18, 2024
In the Court of Common Pleas of Allegheny County Criminal Division at
No(s): CP-02-CR-0004902-2023

BEFORE:  BOWES, J., OLSON, J., and BENDER, P.J.E.

OPINION BY OLSON, J.:                    **FILED: AUGUST 27, 2025**

Appellant, Michael Aldrich, appeals from the judgment of sentence entered on June 18, 2024, following his bench trial conviction for abuse of corpse, 18 Pa.C.S.A. § 5510.  After careful consideration, we affirm.

The trial court briefly summarized the procedural history of this case as follows:

> This is a direct appeal from the judgment of sentence entered on June 18, 2024, following a non-jury trial that was held on an [a]buse of [c]orpse charge.  The trial commenced on January 31, 2024, resumed on February 23, 2024, and concluded on March 13, 2024.  [The trial] court rendered its [guilty] verdict on March 20, 2024, and sentencing was deferred at the request of defense counsel.
>
> On June 18, 2024, [Appellant] was sentenced to a period of one (1) year [of] probation.  A [n]o-[c]ontact order was imposed, prohibiting him from having contact with the [victim's f]amily. [Appellant] was further ordered to comply with the Allegheny County [g]eneral [r]ules of [p]robation and [p]arole as well as DNA [r]egistration.  No post-sentence motion was filed.
> [Appellant] filed a timely appeal on July 11, 2024. [The trial] court issued its [Pa.R.A.P.] 1925(b) [o]rder on July 12, 2024.  On

> August 7, 2024, [Appellant] filed a timely [Rule 1925(b)] [c]oncise
> [s]tatement of [e]rrors [c]omplained of on [a]ppeal[.]

Trial Court Opinion, 9/12/2024, at 1-2. The trial court issued an opinion pursuant to Pa.R.A.P. 1925(a) on September 12, 2024.

In his Rule 1925(b) statement, Appellant claimed that the evidence presented at trial was insufficient to support his conviction for abuse of corpse. More specifically, Appellant, a licensed funeral director and President of the Funeral Directors' Association (FDA), claimed that the evidence at trial was insufficient because the Commonwealth failed to prove that he had the necessary *actus reus* or *mens rea* to commit the crime. *Id.* at 2. In particular, regarding *actus reas*, Appellant asserted that his actions in handling the corpse at issue did not constitute the commission of volitional acts and he suggested that the trial court based his culpability on acts of omission or on grounds akin to vicarious liability. *Id.*, *citing* Appellant's Rule 1925(b) Concise Statement, 8/7/24, at 5-6. Appellant also posited that, because "[n]one of the family members had an expectation of seeing the body again, or of events unraveling in the manner they did," the Commonwealth did not prove the *mens rea* element of abuse of corpse, which required proof that a person knew that their treatment of a corpse would outrage ordinary family sensibilities. *Id.*, *citing* Appellant's Rule 1925(b) Concise Statement, 8/7/24, at 5-6.

In its Rule 1925(a) opinion, the trial court disagreed and concluded that the evidence was sufficient to prove abuse of a corpse beyond a reasonable doubt. It noted that, at the time of trial, Appellant was the President of the FDA and owned multiple funeral homes. *Id.* at 3. According to the trial court,

the Commonwealth presented trial evidence that, in the funeral industry, there are a "*limited* number of ways that a corpse may be stored and handled pending its final disposition." *Id.* (emphasis in original). "[W]ithin 24 hours of death, a body must be (i) placed into a refrigerated unit; (ii) put inside a hermitically sealed container; or (iii) embalmed." *Id.* As the trial court noted, in this case, Dexter Owens (Decedent), died on August 31, 2022. *Id.* His brother, Kelvin Owens (Owens), contacted Appellant and told him that "he wanted a direct cremation and that he did not want to embalm the body." *Id.* at 4. Appellant took Decedent "into his care around 5:00 p.m. on the evening of August 31, 2022." *Id.* Thereafter, Appellant and Owens had several conversations about pricing and services, but Owens ultimately signed a cremation authorization form and entered into a contract with Appellant on September 2, 2022, agreeing to a price of $3,390.00 for the cremation of Decedent. *Id.* at 4-5. According to the trial court, the evidence showed that Appellant never informed Owens that Appellant "did not have a working refrigeration unit to store bodies" or that Decedent "had been sitting in [Appellant's funeral home] prep[eration] room under air conditioning at about 56 degrees since August 31[, 2022.] *Id.* at 5 (record citations and original quotations omitted). Also, "[u]nbeknownst to [Owens, Appellant] had transported [Decedent's] unrefrigerated, unembalmed [remains] to the Professional Cremation Service (PCS) crematory on the afternoon of September 2, 2022." *Id.* at 6. Thereafter, "[o]n September 7, 2022, [Decedent's] family contacted the House of Paradise (HOP) funeral home and

ultimately opted to have HOP tend to [Decedent] since they [offered] to perform the same services as [Appellant] for $1,000[.00]." **Id.** at 5.

Ultimately, Owens officially entered an agreement with HOP on September 8, 2022. **Id.** at 6. That same day, HOP assumed responsibility for handling Decedent's remains and discovered Appellant's "mistreatment of [the] corpse" which had been transported from PCS crematory back to Appellant's funeral home. **Id.** The HOP funeral director noted that when she went to pick up the corpse from Appellant's funeral home, the body was refrigerated, but Appellant admitted that the refrigeration unit was brand new and "that he just plugged it in" that day. **Id.** at 6-7. The HOP director testified that there was a "very bad smell" like "something rotting" in the alleyway outside Appellant's funeral home, which only got worse as she entered the facility. **Id.** Transporting Decedent's body for final cremation, the HOP funeral director noted the stench of rotten flesh was unbearable, fluid poured from the corpse and the body bag, there was an infestation of maggots, and the body was decayed beyond recognition, which HOP documented with photographs. **Id.** at 7-9. Decedent was cremated on September 10, 2022, however, the HOP funeral director "had to share her observations of [Decedent's] body with his family" because they wanted to see Decedent one last time. **Id.** at 9. When Owens went to Appellant's funeral home "to investigate the situation for himself," he could smell a stench outside when he arrived, it made him feel terrible thinking about the state of the body before

- 4 -

cremation, and "he could not fathom how someone could do that to a family." *Id.* at 10. As a result, Owens reported Appellant to the police. *Id.*

Finally, the Commonwealth presented the following evidence at trial. Appellant was investigated by the Pennsylvania Bureau of Enforcement and Investigations. During the course of that inquiry, Appellant admitted that he did not have a working refrigeration unit when he obtained Decedent's body, his unit was not fixed until September 8, 2022, and Appellant never mentioned to Owens that the corpse "had been transferred to the PCS crematory on September 2[, 2022,] before being brought back and [later] transferred to HOP's care" on September 8, 2022. *Id.* at 10-11. As previously mentioned, the Commonwealth also presented an expert in the field of funeral directors who explained that within 24 hours of receiving a corpse, the body must be embalmed, cremated, refrigerated, or hermitically sealed in a special container. *Id.* at 11; *see also id.* at 14 ("Defense witness John Grim, the owner of PCS crematory, is also a funeral director, and he too confirmed the 24-hour rule requiring refrigeration, embalming, or placement into a hermitically sealed container."). The Commonwealth expert also opined that, even if a body is transferred to a third-party for additional services, the initial funeral director remains responsible for the body during the entire process. *Id.* at 12.

Ultimately, the trial court determined that Appellant knowingly and intentionally decided to: "(i) accept [Decedent] into his care even though he did not have a working refrigeration unit; (ii) accept [Decedent] into his care

without promptly arranging for a backup refrigeration plan through a third-party, and (iii) to not explain to [Owens] that he may need to embalm [Decedent's corpse] despite [the] desire for a direct cremation so that the body would not completely and rapidly deteriorate as they figured out next steps." *Id.* at 19. In sum, the trial court opined and concluded:

> [Appellant] left [Decedent's] body out in a prep room at 56 degrees and did not even attempt to set the temperature low enough to mimic refrigeration. [Appellant] left [Decedent's] body out for three days at his own funeral home before sending [it] off to a crematory where [the body] then sat for *at least* another day because [Appellant] chose not to communicate to PCS that the body had yet to be refrigerated. [Appellant] simply left [Decedent's] corpse out to rot for nearly three days at his own funeral home and did not ensure that it would not be left to rot at the crematory.
>
> The [trial] court [was] well-aware that abuse of corpse cases typically involve morbid fact patterns where bodies are mutilated, assaulted or concealed. The [trial] court [was] also mindful of the dearth of caselaw that has applied the statute to facts akin to these. However, [the trial court determined that] the fact remain[ed] that the statute was intentionally construed to encompass a broad range of conduct which may trigger liability in a multitude of different scenarios, including ones that could implicate the very industry that is charged with the important and sensitive duty of caring for corpses pending their final disposition.
>
> \*          \*          \*
>
> [Appellant's] decision to treat [Decedent's] corpse [] in an entirely dismissive and disrespectful manner that was not contemplated by any of the rules and regulations that governed his conduct and that he was charged with knowing, implementing, and communicating to his peers, was very much a volitional and knowing act that [fell] squarely within the definition of improper and offensive treatment. If [Appellant] had acted [] by immediately transporting [Decedent] to a third-party with refrigeration upon receipt of his body, then this would not be a case at all.

\*      \*      \*

The accelerated decomposition of [Decedent's] body was directly attributable to [Appellant's] decision to not promptly and successfully arrange for refrigeration (or utilize any of the other alternatives) for the majority of four days - August 31, September 1, September 2, and September 3[, 2022]. Even if the court [gave Appellant] the benefit of the doubt and overlook[ed] the lack of refrigeration on August 31, 2022 - the day that he assumed care of [Decedent's] body - the fact that he continued to leave [a corpse unrefrigerated] in the days that followed still suffice[d] to support the conviction.

Much ha[d] been made of the fact that [Owens] did not initially communicate a desire to see [Decedent] prior to cremation. However, as three separate funeral directors testified at trial - grieving families change their minds, as [Owens] did here. Moreover, even if families typically are not supposed to view a refrigerated body after 36 hours, [the Commonwealth] expert testified that they can sign a waiver if they truly insist on doing so. In any event, is it really an acceptable defense to say that liability should not attach because no one was supposed to find out about the improper mishandling of the corpse?

With respect to [Appellant's] *mens rea* argument, [the trial] court [found] that it was met under these facts because knowingly storing [a corpse] in an improper and unlawful way that would cause rapid decomposition is an act that would outrage normal family sensibilities. Knowingly failing to comply with industry directives, whether out of convenience, finances, or business practices, is an act that would offend and outrage normal family sensibilities. Knowingly leaving a corpse out to rot for days, which caused a maggot infestation and its fluids to seep out of boxes and [] onto floors, [was] an act that would, and did, outrage normal family sensibilities. When [Appellant] took possession of [Decedent's] body, he had the legal and ethical duty to properly care for that body, no matter the family's delay, his inadequate facilities, or lack of financial renumeration.

Funeral homes operate "behind the veil," so to speak, because grieving families typically are not emotionally and/or mentally equipped to ask the necessary questions about the details of what is happening to their loved one behind the scenes. Many would prefer to remain in the dark altogether about those gruesome technicalities. This is why grieving families place all of their trust

into the hands of the professionals - the funeral directors who must ensure that their loved ones are being properly stored, handled, and treated according to industry laws and regulations.

It may very well be the case that funeral directors routinely conduct business in the manner that was exposed by the instant case since, apparently, the vast majority of funeral homes in this Commonwealth do not have their own refrigeration systems. Given what little oversight there is after a funeral home takes custody of a body, perhaps [Decedent] and this perfect storm of events that exposed [Appellant's] actions should serve as a cautionary tale for the industry, to remind them that they cannot deal in such delicate matters with such little respect or regard for the regulations within which they must conduct their business. Indeed, if the President of the Funeral Directors' Association conducts business in this manner, who is to say what is happening at any other funeral home behind a family's back? The regulations clearly exist to prevent exactly what occurred in this case. Lest we forget, [Decedent's] body was in such horrific condition that a fellow funeral director was the one to essentially blow the whistle on her own colleague and industry.

*Id.* at 19-24 (record and case citations omitted; emphasis in original).

On appeal, Appellant presents the following issues for our review:

1. The abuse-of-corpse statute defines the *actus reus* for the crime as a person "treat[ing] a corpse" in a particular way. Generally, the criminal law penalizes volitional acts of commission, not *omission* – the latter acts generally being the subject of negligence principles and tort law. Did the Commonwealth adduce sufficient evidence to prove Appellant committed the necessary *actus reus*, or did the trial court assign criminal culpability based on the grounds akin to vicarious liability or on acts of omission?

2. The abuse-of-corpse statute defines the *mens rea* for the crime as a person [who] "knows" their treatment of a corpse would "outrage ordinary sensibilities." Did the Commonwealth prove the necessary *mens rea* that Appellant *knew* that certain treatment of the body "would outrage ordinary family sensibilities"?

Appellant's Brief at 4 (emphasis in original).

Appellant's arguments challenge the sufficiency of the evidence to support his conviction for abuse of corpse and, therefore, we will examine them together. First, Appellant claims that the Commonwealth failed to prove that he "treated a corpse," pursuant to the *actus reus* of the abuse of corpse statute, because his "actions were limited to transporting the body and contractual matters only." *Id.* at 17. Instead, Appellant argues that the trial court held him vicariously liable based upon the actions of others. *Id.* at 17-18. Appellant maintains that: (1) he "was not the sole actor in retrieving and bringing [Decedent's] body back to the funeral home" as "[h]e was assisted by an employee;" (2) Appellant "trusted his daughter to make arrangements pertaining to cremation;" and, (3) Decedent's "body was not left out 'to rot'" because Appellant's daughter "slated [] cremation[] and [] coordinated with Professional Cremation Service to take possession of the body for that purpose." *Id.* at 19-20. As such, Appellant suggests that he "has been held solely criminally liable for acts that he did not engage in alone or at all" and, as a result, "bears a criminal record – and the stigma attendant to it – after a long and reputable career as a funeral director[.]" *Id.* at 21; *see also id.* at 22 ("The record simply does not bear out facts that [Appellant] himself was affirmatively deciding not to refrigerate. Perhaps, others were, but [Appellant] is the one who stands convicted and is paying the price."); *see also id.* at 23 ("Again, others made conscientious decisions and took certain actions – but were never charged – and [Appellant] is the one held criminally responsible."). Further, Appellant argues that trial court "faults"

him for his inaction and "for things the court believes he ought to have done" but "consistent with the language of the abuse of corpse statute, the law itself concerns itself with the things [Appellant] *actually* did toward the corpse." ***Id.*** at 24 (emphasis in original). Appellant argues that the trial court misconstrued the seminal abuse of corpse cases, ***Commonwealth v. Hutchison***, 164 A.3d 494 (Pa. Super. 2017) and ***Commonwealth v. Smith***, 567 A.2d 1070 (Pa. Super. 1989), because those cases dealt with concealment which was absent instantly. ***Id.*** at 25-30; ***see id.*** at 26 ("***Hutchinson*** stands for the legal proposition that *concealment* of a corpse is an act sufficient to 'treat a corpse' in a way violative of the law and is more than mere inaction.") (emphasis in original; footnote omitted); ***see id.*** at 28 ("[T]his Court, like in ***Hutchinson***, characterized Smith as 'concealing' her daughter's remains [and] construed that concealment as something more than mere inaction[.]").

Second, Appellant argues that the Commonwealth failed to support his conviction with sufficient evidence regarding the *mens rea* element of the crime of abuse of corpse, or whether he acted knowingly, because Appellant "along with next of kin, had no expectation of seeing the body again[.]" ***Id.*** at 33. He contends that "[t]he record did not make out a showing that [Appellant] was aware that it was practically certain that his conduct – leaving [Decedent's] body in an air-conditioned room – would outrage ordinary family sensibilities where cremation was imminent and Decedent's "family had no expectation of seeing his body again." ***Id.*** at 39.

- 10 -

In **_Commonwealth v. Hutchison_**, 164 A.3d 494 (Pa. Super. 2017),[1]

this Court previously determined:

> "Whether sufficient evidence exists to support the verdict is a question of law; our standard of review is _de novo_ and our scope of review is plenary." **_Commonwealth v. Giron_**, 155 A.3d 635, 638 (Pa. Super. 2017) (citation omitted). In assessing [a] sufficiency challenge, we must determine "whether viewing all the evidence admitted at trial in the light most favorable to the Commonwealth, there is sufficient evidence to enable the factfinder to find every element of the crime beyond a reasonable doubt." **_Commonwealth v. Williams_**, 153 A.3d 372, 375 (Pa. Super. 2016) (citation omitted). "The evidence need not preclude every possibility of innocence and the fact-finder is free to believe all, part, or none of the evidence presented." **_Commonwealth v. Kennedy_**, 151 A.3d 1117, 1121 (Pa. Super. 2016) (citation omitted).
>
> The Crimes Code makes it an offense to "treat a corpse in a way that one knows would outrage ordinary family sensibilities." 18 Pa.C.S.A. § 5510 (defining the crime of abuse of a corpse).
>
> \*　　\*　　\*
>
> We conclude[d] that, under this Court's decision in **_Commonwealth v. Smith_**, 567 A.2d 1070 (Pa. Super. 1989),

---

[1] In **_Hutchinson_**:

> [Hutchinson] and Brianne Miles ("Miles") rented an apartment together. On July 7 or 8, 2015, Miles died of a drug overdose in the apartment. [Hutchinson] discovered Miles' body on July 8, 2015. Two days later, [Hutchinson] finally called police and notified them that there was a dead body in the apartment. When police arrived, [Hutchinson] originally told them that he discovered Miles' body that morning. Police found drug paraphernalia in the apartment.

**_Hutchison_**, 164 A.3d at 496. Ultimately, we concluded that Hutchinson "failed to notify authorities of Miles' death and let her corpse rot" which was sufficient evidence to support his conviction for abuse of corpse. **_Id_** at 498.

*appeal denied*, 585 A.2d 468 (Pa. 1990), the evidence was sufficient to convict [Smith] of abuse of a corpse. In **Smith**, the defendant starved her three-year-old child to death. After [Smith] discovered the child's body, she moved out of the apartment and did not report the child's death to authorities. Three months later, maintenance workers entered the apartment to shut off the utilities and discovered the child's decomposing and mummified remains. [Smith] was convicted of abuse of a corpse. On appeal, she argued that her inaction in failing to notify authorities of the child's death was not covered by the abuse of a corpse statute.

This Court framed the issue as "whether a person who knowingly leaves a corpse to rot, without making arrangements for a proper burial has treated a corpse in a way that she knows would outrage ordinary family sensibilities." **Id.** at 1073 (internal quotation marks and alterations omitted). Relying upon the commentaries to the Model Penal Code, which Section 5510 is based on, this Court held that "the purpose of drafting the abuse of corpse statute in very broad and general language was to ensure that offenses such as concealing a corpse came under the purview of the statute." **Smith**, 567 A.2d at 1073.[2] That is what occurred in [**Hutchinson**]. [Hutchison] concealed Miles' corpse from authorities so that she could not receive a proper burial. Under **Smith**, this inaction violates section 5510.

*      *      *

[T]his Court only focused on the fact that [Smith] failed to notify authorities of the child's death and chose instead to let her corpse rot. The same thing occurred in [**Hutchinson**]. [Hutchinson] failed to notify authorities of Miles' death and let her corpse rot.

*      *      *

The facts in **Smith** [further] showed that the child was locked in the room prior to her death. **Id.** at 1072. Therefore, it was not the locking of the child's corpse in her bedroom that provided sufficient evidence for Smith to be convicted of abuse of a corpse. Instead, it was what occurred after the child died, *i.e.*, [Smith's] failure to notify authorities of the child's death, that provided

---

2    We specifically rejected Smith's "assert[ion] that there must be some affirmative act upon the corpse, and that her inaction with regard to the corpse precipitated nothing more than the natural decaying process." **Smith**, 567 A.2d at 1072.

sufficient evidence to convict her of abuse of a corpse. The reason this Court discussed the child being locked in her room related solely to the determination that the evidence was sufficient to convict [Smith] of third-degree murder.

Thus, the fact that the child was locked in her room was not a factor in this Court's determination that [Smith] was guilty of abuse of a corpse. Instead, this Court only focused on the fact that [Smith] failed to notify authorities of the child's death and chose instead to let her corpse rot. The same thing occurred in [*Hutchinson*]. [Hutchison] failed to notify authorities of Miles' death [by drug overdose] and let her corpse rot [for two days before calling police].

\*　　\*　　\*

[I]t was the fact that [Smith] failed to notify authorities of the child's death and left her corpse to rot. Accordingly, we h[eld] that the evidence was sufficient to convict [Smith] of abuse of a corpse.

*Hutchison*, 164 A.3d at 497–499 (original brackets and footnote omitted).

Here, as detailed above, and viewing the facts in the light most favorable to the Commonwealth as required, we conclude that, similar to *Hutchison* and *Smith*, there was sufficient evidence presented at trial that Appellant knowingly left Decedent's corpse to rot, without making proper burial, storage, or transport arrangements, and treated his corpse in a way that Appellant knew would outrage ordinary family sensibilities. Initially, we note that Section 5510 was drafted in very broad and general language to encompass a wide variety of actions and **inactions** with regard to abuse of corpse. We have previously determined that failure to act and knowingly permitting the natural decaying process to allow a corpse to rot constitutes a violation of Section 5510. *See Smith* and *Hutchinson*. As such, we reject Appellant's

suggestion that concealment is necessary and that inaction alone cannot form the basis of an abuse of corpse. Further, upon review of this case, the trial court simply did not hold Appellant to a higher standard than others, or find Appellant vicariously liable, as a funeral director. Instead, the Commonwealth provided evidence of industry standards in the funeral business, in an effort to show that Appellant's inaction was volitional and deliberate. Appellant knew what needed to be done in order to suitably preserve Decedent's body for proper disposal, but he failed to take these measures in handling the corpse. Moreover, even if there were no initial expectation that the family would ever see Decedent's body again, any person, funeral director or otherwise, would understand that family sensibilities would be offended if a corpse were allowed to decompose for days. This decomposition led to fluid seepage, maggot infestation, and unbearable decay and stench witnessed by Owens. Appellant failed to take proper precautions to prevent corpse rot, and Decedent's remains offended family sensibilities. As such, we conclude that the Commonwealth presented sufficient evidence to support Appellant's conviction, and no relief is due.

Judgment of sentence affirmed.

Judgment Entered.

_Benjamin D. Kohler_

Benjamin D. Kohler, Esq.
Prothonotary

DATE: 8/27/2025